# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| ERIC L. CONERY,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>JONATHAN PAWLYK, RUSSELL CARLE, CHRISTINA TURNER, and BRITTANY LEISURE,<br><br>　　　　　　　Defendants. | Case No. 18-CV-1606-JPS<br><br><br>**ORDER** |

**1.　INTRODUCTION**

On February 8, 2019, Magistrate Judge David E. Jones screened Plaintiff's complaint and allowed him to proceed on a claim under the Eighth Amendment for Defendants' deliberate indifference to the substantial risk of Plaintiff harming himself. (Docket #10). On March 4, 2019, the case was reassigned to this Court. On October 16, 2019, Defendants filed a motion for summary judgment. (Docket #29). The motion is fully briefed. For the reasons explained below, Defendants' motion for summary judgment must be granted.

**2.　STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016).

In assessing the parties' proposed findings of fact, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). Internal inconsistencies in a witness's testimony "'create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all.'" *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1170 (7th Cir. 1996) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986)). The non-movant "need not match the movant witness for witness, nor persuade the court that [its] case is convincing, [it] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

3.   **FACTUAL BACKGROUND**

Plaintiff, Eric Conery ("Conery"), is an inmate who was housed at Waupun Correctional Institution ("Waupun") at the time of the relevant events. (Docket #43 at 1). Defendants were employed by the Wisconsin Department of Corrections ("WDC") at Waupun during the relevant events. (*Id.* at 1–2). At Waupun, Defendant Jonathan Pawlyk ("Pawlyk") was a Correctional Sergeant, and Defendants Russell Carle ("Carle"), Brittany Leisure ("Leisure"), and Christina Turner ("Turner") were Correctional Officers (collectively, "Defendants"). (*Id.*)

Conery has a history of self-harm and has cut himself since childhood. (*Id.* at 18). Conery admits that he cuts himself to achieve a certain feeling and uses it as a coping mechanism. (*Id.* at 19). Conery claims that he cuts himself because he likes the smell of the blood and he likes to feel the rips of the skin through the flesh. (*Id.*) Conery stated that when he feels like he wants to hurt someone else, he will cut himself to calm down and it relaxes him. (*Id.*) Conery also has a history of cutting himself at Waupun to get staff attention, and when he does not get what he wants. (Docket #39-1 at 17–20, 22). None of Conery's cutting incidents at Waupun required off-site treatment. (*Id.*)

In July 2018, Conery had been recently released from segregation and was placed on the south cell hall ("SCH"). (Docket #41 at 2–3). On July 15, 2018, Conery asked Pawlyk why Conery had not received his personal property (a T.V.) after being released from segregation. (Docket #43 at 2–3). Pawlyk told Conery that Pawlyk had no control over the property room, and that Conery's name was not on the list of inmates to receive property. (*Id.*) This conversation happened every morning from July 15 to July 18, 2018. Conery claims that he began to feel suicidal around July 16, 2018 because he did not have his property. (*Id.* at 2). Conery's suicidal feelings worsened from July 16 to July 18, but Conery did not tell anyone because he "wasn't to the point where he felt as if he was going to act upon it." (*Id.*) On July 18, 2018, Conery had made up his mind that he was going to cut himself if he did not receive his property. (*Id.* at 3).

The morning of July 18, 2018, Conery asked about his personal property and Pawlyk told him his name was not on the list to receive property. (Docket #41 at 2–3). Pawlyk's response agitated and further irritated Conery. (*Id.* at 3). Conery claims he told Pawlyk that Conery was

having suicidal ideations and needed to go into "suicide watch." (*Id.*) Pawlyk asked Conery if he had a plan to commit self-harm, and Conery said that he did not. (Docket #43 at 5). After talking with Conery, Pawlyk contacted the Psychological Services Unit ("PSU") and spoke with Dr. Van Buren. (*Id.* at 5–6). Pawlyk informed Dr. Van Buren that Conery was agitated about not receiving his property and stated he needed to go to suicide watch. (*Id.*) Pawlyk also told Dr. Van Buren that Conery said he did not have a plan to hurt himself. (*Id.*) Dr. Van Buren told Pawlyk to contact her if Conery informed staff of a plan of self-harm. (Docket #30 at 2).

Later that morning, Conery spoke to Turner and told Turner that he was having suicidal thoughts. (Docket #45 at 6–7). Turner does not recall Conery speaking to her, but it is her usual practice to gather information about whether the inmate had a plan or a weapon with which to use to self-harm. (Docket #31 at 5). If the inmate did not, she would inform the unit sergeant. (*Id.*) Around 10:30 a.m., Leisure was making her rounds and Conery asked her about his property. (*Id.*) Leisure responded that she did not know anything about Conery's property. (*Id.*) Conery told Leisure that he was suicidal. (*Id.*) Leisure asked Conery if he was in immediate danger and if he would be safe long enough for her to leave his cell front to notify the Sergeant. (*Id.*) Conery stated "that's fine" and asked Leisure to open his trap so he could get a meal tray. (*Id.*) Conery did not indicate that he had a plan to harm himself. (*Id.* at 5–6). Leisure informed Pawlyk around 10:40 a.m. that Conery asked her about his property and then told her he was suicidal. (*Id.* at 6). Pawlyk asked if Conery told Leisure that he had a plan, and Leisure stated that he had not. (*Id.*) Pawlyk told Leisure about Conery's agitated state due to not receiving his property and that PSU determined that Conery did not need to be in observation status at this time. (*Id.*)

Around 12:47 p.m., Conery had not received anything from the property room staff and no one from PSU had contacted him. So Conery decided to take a large paperclip, sharpen it, and use it to cut his left arm. (Docket #45 at 8–9). Conery did not tell anyone that he had sharpened a paper clip and was planning to use it to cut himself. (Docket #43 at 14). Conery stated that he did not feel like he had to tell correctional staff about the paper clip. (*Id.*) No one saw Conery sharpening the paper clip or Conery cutting himself. (*Id.*) Conery had cut himself in the same spot on July 6, 2018. (Docket #31 at 7).

About an hour later, Conery saw Carle and called him over to his cell. (Docket #45 at 10). Conery showed Carle the cut he made on his arm, but it was not bleeding. (Docket #43 at 15). Conery told Carle that he wanted to cut himself. (*Id.*) Carle asked Conery if he had any sort of weapon in his cell and Conery stated he did not. When Carle asked if Conery had a plan to harm himself, Conery responded "Don't worry about it." (*Id.*) Carle told Conery that he would inform the Sergeant and walked away. (*Id.*) Around 1:45 p.m., Carle informed Pawlyk that Conery was complaining about not receiving his property and stated he wanted to cut himself. (Docket #31 at 8). Pawlyk asked Carle if Conery had a plan to harm himself, and Carle stated he did not. (*Id.*) Pawlyk told Carle about Conery's agitated state due to not having his property and that PSU had determined that Conery did not need to be on observation status at this time. (*Id.*)

Conery was cutting himself from around 12:47 p.m. to 2:00 p.m. (Docket #43 at 16). Around 2 p.m., Conery showed Correctional Officer Michael Zepka ("Zepka") his arm and Zepka informed Lieutenant Keith Immerfall ("Immerfall"). (*Id.* at 16–17). Immerfall arranged for Conery to be seen at the Health Services Unit ("HSU"). (*Id.*) Conery flushed the

sharpened paper clip down the toilet around 2 p.m. when he spoke with Zepka. (*Id.* at 17). At around 5:30 p.m., Conery took a shower and received his medication. (*Id.*)

Conery was seen by Nurse Ann York ("Nurse York") at HSU around 5:45 p.m. (Docket 39-1 at 14). Conery told Nurse York that he was upset about not receiving his property. (Docket #43 at 17). Nurse York measured Conery's cut at 4.3 cm long by 0.3 cm wide, by 0.1 cm deep. (*Id.*) Nurse York noted that Conery had reopened a recent scar area. (Docket #39-1 at 15). Nurse York cleansed Conery's left forearm and applied Bacitracin, 2x2 gauze and a large band aid. (*Id.*) Conery confirmed he had no pain. (Docket #43 at 17). Conery denied any further plan of self-harm. (*Id.*) Conery was returned to his cell. Later, when Leisure returned to SCH, Conery approached her saying, "See, I told you I was going to hurt myself" and showed her the band aid on his arm. (*Id.* at 18).

The next day, July 19, 2018, Conery met with Dr. Devona Gruber ("Dr. Gruber") at PSU. (Docket #41-1 at 6). PSU was not made aware of Conery's self-harm until July 19, 2018. (*Id.*) Conery told Dr. Gruber that he cut himself in the morning on July 18, 2018 because he did not receive his prescribed medication. (*Id.*) HSU cleaned and bandaged Conery's cut, which did not require stitches or other medical care. (*Id.*) Conery told Dr. Gruber that he did not have any thoughts or intent to engage in further self-harm, and that he did not require observation status. (*Id.*)

On September 13, 2018, Captain Wayne Bauer ("Bauer") completed his investigation into the claims made by Conery that Pawlyk knew that Conery was feeling suicidal but Pawlyk refused to get Conery the help he needed, which resulted in Conery committing self-harm. (Docket #32 at 2). Bauer's report concluded that:

> I believe it is more likely than not that inmate Conery made his false claims in retaliation for not receiving his property and considering his [sic] the focus of his attention was that of Sgt. Pawlyk I also believe it is more likely than not that inmate Conery made his claim directed toward Sgt. Pawlyk in particular in retaliation for Sgt. Pawlyk not getting the property department to get inmate Conery his property in the very begining [sic].

(Docket #41-1 at 5).

### 4. ANALYSIS

As noted above, Plaintiff was allowed to proceed on an Eighth Amendment claim of deliberate indifference to a serious medical need, specifically suicide or attempted suicide. To sustain this claim, Plaintiff must show: (1) an objectively serious medical condition; (2) that Defendant subjectively knew the prisoner was at substantial risk of committing suicide; and (3) defendant intentionally disregarded the risk which resulted in some injury. *Lord v. Beahm*, 952 F.3d 902, 904 (7th Cir. 2020); *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010); *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006).

#### 4.1 Objectively Serious Medical Condition

First, the Court must address whether Plaintiff has shown he had an objectively serious medical condition. *Gayton*, 593 F.3d at 620. "Normally, a completed or attempted suicide satisfies the 'serious medical condition' element. However, a plaintiff still bears the burden to show that their suicidal ideation or the self-harm they inflicted was indeed 'objectively [and] sufficiently' serious." *Jones v. Menning*, No. 17-CV-1316-JPS, 2018 WL 2860045, at *2 (E.D. Wis. June 11, 2018) (citing *Pittman ex rel. Hamilton v. Cty. of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014); *Collins*, 462 F.3d at 760. An objectively serious medical condition is one that "has been diagnosed by a

physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008).

Recently, the Seventh Circuit ruled on a very similar case to Conery's. In *Lord v. Beahm*, 952 F.3d 902, 904 (7th Cir. 2020), an inmate called to a correctional officer ("CO") to get her attention; when she turned, the inmate was acting in a sexually inappropriate manner. The CO informed the inmate that he would receive a conduct report and walked away. *Id.* The inmate "began shouting that he had a razor blade and was going to kill himself." *Id.* Thirty minutes later, another CO saw two blood droplets on the inmate's cell door window. *Id.* The CO asked the inmate what he was doing, and the inmate responded by "displaying a razor blade and saying he was trying to kill himself." *Id.* Once the razor was secured, the inmate was given medical attention. *Id.* The only medical treatment that the inmate's minor scratches needed was a gauze bandage. *Id.*

The Seventh Circuit began by stating how serious suicide is, but noted that "[t]his case is different, as it reflects an inmate's insincere suicide threat to get attention." *Id.* at 904–05. The Seventh Circuit held that the inmate's Eighth Amendment violation claim failed because he did not have a recoverable injury. *Id.* at 905 (citing *Wilson v. Garcia*, 471 U.S. 261, 278 (1985) (recognizing that § 1983 confers "a general remedy for injuries to personal rights"); *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1032 (7th Cir. 2019) (quoting *Roe v. Elyea*, 631 F.3d 843, 864 (7th Cir. 2011)) ("In order to succeed in a § 1983 suit, a plaintiff must 'establish not only that a state actor violated his constitutional rights, but also that the violation caused the plaintiff injury or damages.'"); *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) ("Section 1983 is a tort [and] [a] tort to be actionable requires

injury.")). Viewing the facts in a light most favorable to the inmate, the Seventh Circuit found:

> [The] [inmate's] physical injuries consisted only of minor scratches, quickly and easily treated with a gauze bandage. By any measure, the injuries were trivial—indeed, almost nonexistent—and [the] [inmate] supplied no evidence that he suffered any other form of injury (for example, psychological harm) from his insincere suicide threat.

*Lord*, 952 F.3d at 905. Other Courts have found that minor injuries do not constitute an objectively serious medical condition.[1]

In this case, Conery cut himself, but the cut was minor (4.3 cm long by 0.3 cm wide, by 0.1 cm deep) and only required gauze and a band aid. This injury is simply not an objectively serious medical condition. It should be noted that this injury was not minor because someone stepped in to stop Conery from hurting himself further. Instead, Conery produced this minor injury over several hours alone. The record makes it clear that Conery's threats of hurting himself and his minor self-inflicted injury were done as either a coping mechanism for not getting his property or a tactic to manipulate the Defendants into giving him his property. In either case, the injury does not rise to the level necessary to meet the first prong of the Eighth Amendment deliberate indifference standard. The Court notes that it does not diminish the seriousness of self-inflicted injuries and suicide, but rather like the Seventh Circuit in *Lord*, finds this case to be an insincere threat to get attention or to manipulate others.

---

[1]*James v. Cartwright*, 659 Fed. Appx. 888, 890–91 (7th Cir. 2016) (minor cuts and bruises); *Flemming v. Breen*, No. 19-CV-1166, 2020 WL 4700911 (E.D. Wis. Aug. 13, 2020) (four small cuts to his arm); *Jones v. Menning*, No. 17-CV-1316-JPS, 2018 WL 2860045 (E.D. Wis. June 11, 2018) (small cuts to arm).

### 4.2 Deliberate Indifference

For the sake of completeness, the Court will provide a short analysis as to why Defendants were not deliberately indifferent to Conery. However, it is not necessary, as Conery has failed to establish the first prong, which requires an objectively serious medical condition. "Only if the objective prong is satisfied is it necessary to analyze the second, subjective prong, which focuses on whether a defendant's state of mind was sufficiently culpable." *Greeno v. Daley*, 414 F.3d 645, 652–53 (7th Cir. 2005).

As to the second prong, Conery must establish that Defendants failed to take reasonable steps to prevent him from committing suicide and/or self-harm. *Estate of Novack ex rel. Turbin v. Cty. of Wood*, 226 F.3d 525, 529 (7th Cir. 2000). This is a heavy burden; the Seventh Circuit has emphasized that deliberate indifference "comprehends more than mere negligence but less than the purposeful or knowing infliction of harm." *Id.* Indeed, the Court of Appeals has characterized the required showing "as 'something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks.'" *Collins*, 462 F.3d at 762 (quoting *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992)). Accordingly, to establish deliberate indifference, the plaintiff must present evidence "that an individual defendant intentionally disregarded the known risk to inmate health or safety." *Id.*; *Matos ex. rel. Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003).

Conery cannot meet this heavy burden to establish his claim of deliberate indifference. Each time Conery made a statement to Defendants regarding feeling suicidal or claiming he would hurt himself, Defendants stopped what they were doing and investigated. Defendants would ask Conery if he had a plan to hurt himself, and each time, he told them no or

words to that effect. Further, the Defendants would report Conery's statements: Pawlyk to Dr. Van Buren, and Turner, Carle, and Leisure reported to Pawlyk. Conery lied to Defendants and said he did not have a plan, when in fact Conery has admitted that he decided he would hurt himself on July 18, 2018 if he did not get his property. Additionally, Conery lied to Defendants when he said he did not have a weapon to hurt himself. Defendants acted with diligence and interacted with Conery throughout the day. Based on Conery's behavior—his focus on obtaining his property, and then when he got a response he did not like, he would threaten self-harm—and Conery's responses to Defendants' investigations, the Defendants did not act with deliberate indifference to Conery's threat of self-harm or suicide. Thus, Conery has failed to meet the burden of both prongs of an Eighth Amendment deliberate indifference claim.

5. **CONCLUSION**

Viewing the undisputed facts in the light most favorable to Conery, the Court finds that it must grant Defendants' motion for summary judgment and dismiss this action with prejudice.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment (Docket #29) be and the same is hereby **GRANTED;** and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 17th day of September, 2020.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge